**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO: 0:23-cv-60173

VANGUARD PLASTIC SURGERY, PLLC,
d/b/a VANGUARD AESTHETIC AND
PLASTIC SURGERY, a Florida professional
limited liability company,

       Plaintiff,

vs.

CIGNA HEALTH AND LIFE INSURANCE
COMPANY, a foreign corporation,

       Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Vanguard Plastic Surgery, PLLC d/b/a Vanguard Aesthetic & Plastic Surgery, a Florida limited liability company ("Plaintiff"), sues Defendant Cigna Health and Life Insurance Company, a foreign corporation ("Defendant"), and alleges as follows:

### Nature of Action

1.    This action arises under Florida state law in connection with the unreasonably low rates at which Defendant reimbursed Plaintiff for medical services Plaintiff provided to patient A.G. ("Patient"), who at all material times was a member of a group health insurance policy issued and/or administered by Defendant (the "Policy").

2.    Plaintiff provided medically necessary services to Patient consisting of three different complex surgical procedures (collectively, the "Surgeries") relating to Patient's diagnosis of compartment syndrome (a painful, serious condition caused by pressure buildup from internal

Shapiro, Blasi, Wasserman & Hermann, P.A.
Attorneys for Plaintiff

bleeding or swelling of tissues) in the right lower extremity and associated conditions, including renal failure and neurosensory loss in the right foot.

3.     Due to Patient's history of compartment syndrome, fasciotomies and significant treatment as a result of Patient being grossly unhealthy given the nature of Patient's injuries at the time Patient presented to Plantation General Hospital ("PGH"), Patient required multiple surgical interventions to relieve or eliminate the conditions for which Patient first presented for treatment and/or those that developed during the course of Patient's treatment.

4.     The surgical procedures Plaintiff performed included: (1) extensive excision of skin graft and complex closure; (2) extensive excisional debridement of skin and subcutaneous tissue, necrotic muscle, and muscle flaps; (3) placement of wound VAC; and other related procedures.

5.     Plaintiff is not attempting to stand in the shoes of Patient and does not seek to enforce any rights under any health insurance policy issued, operated, and/or administered by Defendant. Rather, Plaintiff is asserting independent claims under Florida state law: (a) for breach of an express written contract (i.e., the Network Savings Agreement, as defined below), pursuant to which Defendant agreed to pay Plaintiff directly for such services at a discounted rate (i.e., the TRPN Rate, as defined below); and (b) in the alternative, for promissory estoppel, breach of implied-in-fact contracts, and unjust enrichment, pursuant to which Defendant is obligated to reimburse Plaintiff at either the TRPN Rate or the reasonable fair market value of such services.

## Parties

6.     Plaintiff is a Florida professional limited liability company with its principal place of business located in Broward County, Florida.

7.     Defendant is a foreign for-profit corporation with its principal place of business located in Bloomfield, Connecticut. Defendant is, and at all material times was, a health insurer

and/or health claims administrator actively engaged in the transaction of health insurance servicing in the state of Florida and providing managed healthcare products and administrative services throughout Florida, including in Broward County, Florida. Defendant holds, and at all material times held, a certificate of authority as a life and health insurer in the state of Florida, as reflected in the records of the Florida Office of Insurance Regulation.

## Jurisdiction and Venue

8.      This Court possesses original jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of costs and interest.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (a) a substantial part of the events or omissions giving rise to this action occurred in this jurisdiction, the subject medical procedures were provided in this jurisdiction, and Defendant's underpayment of the associated claims unfolded in this jurisdiction, and (b) this Court has personal jurisdiction due to Defendant's minimum contacts in this forum.

## General Allegations

10.     Plaintiff, through its physicians, provides medical services, including emergency services and care, reconstruction services, and other surgical services, to patients in Broward County, Florida, including at PGH.

11.     Plaintiff's physicians are licensed medical doctors practicing in the State of Florida.

12.     Plaintiff's physicians are board-certified plastic surgeons who perform skin grafts, flap procedures, microsurgeries, and other surgical services that allow for complex repair of human tissue after trauma, cancer, or congenital defects.

13.     Upon information and belief, Plaintiff's physicians, who are fellowship trained and who specialize in microsurgery, are the only plastic surgeons with privileges at PGH with those qualifications.

14.     Defendant provides coverage for healthcare services provided to members of its managed healthcare products in the state of Florida.

15.     At all material times, Defendant was the claims administrator of the Policy responsible for administering and/or paying claims for medical services provided to Patient.

16.     At all material times, Defendant collected premiums, fees, and/or other forms of compensation in exchange for agreeing to administer claims and properly reimburse providers (like and including Plaintiff) that render medical services to Patient and Defendant's other members.

17.     In exchange for premiums, fees, and/or other forms of compensation, Defendant is obligated to pay for the covered medical services received by Patient and Defendant's other members.

18.     Managed care organizations, like and including Defendant, are required to maintain an adequate number and type of providers within their networks to ensure that their members have access to and receive medically necessary without unreasonable delay or burden.

19.     Upon information and belief, PGH is and was at all material times "in-network" with Defendant.

20.     To ensure that Patient and Defendant's other members can access and receive medical care without unreasonable delay or burden, Defendant: (a) maintains a network of healthcare providers and medical facilities that provide medical services to Defendant's members (commonly referred to as "in-network" medical providers/medical facilities); and (b) has entered

into separate contractual relationships with medical providers that were not "in-network" with Defendant—especially those "out-of-network" providers (like and including Plaintiff) that provide complex medically necessary treatments at "in-network" facilities (like and including PGH) — through supplemental "shared savings" networks (like and including the Three Rivers Provider Network).

<u>*The TRPN Network Savings Agreement and the Parties' Course of Dealings*</u>

21.     At all material times, Plaintiff was a provider in network savings programs,[1] including the Three Rivers Provider Network ("TRPN").

22.     Network savings programs (like TRPN) provide payers (like Defendant) the right to access out-of-network providers (like Plaintiff) at a negotiated, discounted rate of reimbursement for services provided to insureds (like Patient) while maximizing the insureds' benefits by eliminating the out-of-network providers' right to balance bill the insureds.

23.     In multiple publications—including publications directed to providers like Plaintiff—Cigna represents that it recognizes network savings programs, like TRPN, for services provided to its members, pursuant to which discounts are available to its members. *See, e.g.*, https://www.cigna.com/assets/docs/health-care-professionals/id-card-brochure.pdf  (last   visited Jan. 19, 2023) ("Network Savings Program (NSP) logo indicates that out-of-network discounts may be available to the customer.").

24.     Further, Defendant routinely defines "participating providers" to include providers that have "directly or indirectly contracted with Cigna."

---

[1].     These "networks" are also referred to as "rental networks," "medical discount networks," "repricing companies," and various other names. However, because Defendant appears to use the phrase "network savings program," that same terminology is used throughout this Complaint.

25.     By representing that it recognizes network savings programs like TRPN for services provided to its members, and by defining "participating providers" to include providers that have indirectly contracted with Cigna through an intermediary like TRPN, Defendant created the appearance that TRPN had the authority to enter into agreements with providers on Defendant's behalf.

26.     On or about July 1, 2015, Plaintiff and Defendant, through Defendant's authorized agent, TRPN, entered into a contract setting forth Plaintiff's and Defendant's rights and obligations relating to the parties' participation in TRPN (the "Network Savings Agreement").

27.     The Network Savings Agreement provides that "TRPN contracts with insurance companies, third party administrators, health plans, individuals and entities that directly or indirectly access TRPN contracted providers for covered services," which it refers to as "Clients" (each, a "TRPN Client").

28.     TRPN disclosed and otherwise provided Plaintiff with a list of all TRPN Clients (the "Payer List") that agreed to participate in TRPN and/or subject themselves to the terms of the Network Savings Agreement.

29.     At all material times, Defendant was specifically identified in the Payer List as being a TRPN Client that had: (a) contracted with TRPN for the purpose of directly or indirectly accessing Plaintiff to provide "covered services" to Patient and Defendant's other members; (b) retained TRPN as Defendant's billing intermediary to negotiate a reasonable reimbursement rate for all medically necessary services provided by Plaintiff; (c) expressly agreed to participate in TRPN; and/or (d) agreed to be subject to and otherwise bound by the terms of the Network Savings Agreement.

30.     At all material times, Defendant, through TRPN: (a) procured discounted rates from Plaintiff on Defendant's behalf; (b) obtained the right for Defendant the right to access Plaintiff at a negotiated, discounted rate of reimbursement for all medically necessary services Plaintiff provided to Patient; (c) allowed Defendant to meet its statutory obligations to provide coverage for emergency medical services; and/or (d) allowed Patient to avoid being subject to balance billing for the services that Plaintiff provided to Patient.

31.     At all material times, Plaintiff reasonably believed that TRPN had authority to act as Defendant's agent in negotiating and entering into the Network Savings Agreement on behalf of Defendant.

32.     TRPN notified Plaintiff that, at all material times, Defendant was and is a disclosed principal to the Network Savings Agreement. Additionally, or in the alternative, the disclosure of Defendant as a "TRPN Client" subject to the Network Savings Agreement expressed an intent by the parties to the Network Savings Agreement that said contract would confer a primary and direct benefit upon Defendant.

33.     Pursuant to its participation in TRPN and/or the Network Savings Agreement, each TRPN Client (like and including Defendant) agreed to pay certain "out-of-network" medical providers (like and including Plaintiff) for any "covered services" provided to members enrolled under an insurance policy issued and/or administered by said TRPN Client (like and including Patient) at a seven percent (7%) discount for all billed charges, less any applicable patient responsibility amounts such as co-payments, co-insurance, or deductibles (the "TRPN Rate").

34.     Pursuant to TRPN, the term "covered services" includes all services that are medically necessary.

35.     Through TRPN, Defendant inured a direct benefit by securing discounted rates from Plaintiff and other providers for medical services provided to Patient and its other members.

36.     In exchange, Plaintiff agreed not to balance bill any members enrolled under an insurance policy issued and/or administered by said TRPN Client (like and including Patient).

37.     Accordingly, Defendant agreed to pay (and Plaintiff agreed to accept payment) for any medically necessary services that Plaintiff provided to Patient at the TRPN Rate.

38.     In other words, Defendant agreed to pay Plaintiff 93% of all billed charges for all medically necessary services provided to Patient, including the Surgeries.

39.     Subsequently, Plaintiff and Defendant established a course of dealings whereby: (a) Defendant reimbursed Plaintiff at the TRPN Rate for medically necessary services that Plaintiff provided to other of Defendant's members similar to the services Plaintiff provided to Patient in this case; and/or (b) Defendant attempted to negotiate an even lower reduced reimbursement amount based on the fair market or reasonable value of such services.

40.     Further, Patient's member ID card, issued by Defendant, indicates that Defendant recognizes network savings programs, like TRPN, for services provided to Patient.

41.     As such, Plaintiff performed the Surgeries with the understanding and expectation that Defendant would reimburse Plaintiff for the Surgeries at rates equal to the TRPN Rate or, at a minimum, at the reasonable, fair market value for such services.

42.     Defendant therefore agreed and is obligated to reimburse Plaintiff for the Claims at 93% of the billed charges (i.e., the TRPN Rate) pursuant to the Network Savings Agreement and/or the parties' participation in TRPN. Alternatively, Defendant is obligated to pay Plaintiff under the parties' implied contracts and the doctrine of quantum meruit the reasonable fair market value of the services rendered.

43.     Instead, as alleged further below, Defendant improperly failed to pay Plaintiff at either the TRPN Rate or the reasonable fair market value for the services provided as part of the Surgeries.

44.     In its course of performance prior to Plaintiff's provision of the services at issue here, Defendant paid Plaintiff at TRPN Rate for services similar to those at issue here and expressly referenced "TRPN" in the remittance documents it sent to Plaintiff for those services. By doing so, Defendant at the very least ratified the Network Savings Agreement.

45.     Based in part on Defendant's public representations that it recognizes network savings programs like TRPN for services provided to its members, Defendant defining "participating provider" to include providers with which it has an indirect contractual relationship, TRPN's Payer Lists identifying Defendant as a TRPN payer, and Defendant's payment to Plaintiff at TRPN Rate as required by the Network Savings Agreement, Plaintiff reasonably believed that TRPN had authority to act as Defendant's agent in representing in the Network Savings Agreement that Defendant, as a TRPN "Client," would pay Plaintiff the TRPN Rate for services provided to Defendant's members.

46.     Accordingly, TRPN was an agent for Defendant and entered into the Network Savings Agreement on Defendant's behalf and with Defendant's authority.

*Relevant Medical History and Initial Emergency Evaluation and Treatment*

47.     On or about September 19, 2022, Patient presented to the emergency department at PGH suffering from compartment syndrome (a painful, serious condition caused by pressure buildup from internal bleeding or swelling of tissues) in the right lower extremity; associated rhabdomyolysis (i.e. a breakdown of muscle tissue that releases damaging proteins and electrolytes

into the blood), renal failure, neurosensory loss in the right foot, and general lack of function; and a previous history of deep vein thrombosis ("DVT").

48.     Plaintiff's physician was contacted as the on-call surgeon for care at PGH after Patient first presented to PGH.

49.     After Patient was evaluated by multiple specialists, Plaintiff's physician and/or other treating physicians at PGH determined that Patient suffered from urgent or emergency medical conditions, and that Patient required immediate medical attention to treat those conditions.

50.     More specifically, Plaintiff's physicians, in conjunction with Patient's other treating physicians at PGH, determined that Patient required staged operations, with fasciotomies to be performed by orthopedic surgeons first, after which Plaintiff's physicians would assume Patient's care for closure of Patient's wounds and debridement of nonviable muscles.

51.     Accordingly, Patient was admitted to PGH through the emergency department for additional intervention and treatment.

52.     Upon information and belief, with full knowledge of the circumstances, Defendant: (a) approved of Patient's admissions to PGH in or around September 2018 and June 2019 for the treatment of Patient's medical conditions; (b) approved of the provision of medical services to Patient by providers like Plaintiff during said hospital admissions; and (c) impliedly agreed to pay Plaintiff and other providers for such services.

53.     After Patient was admitted to PGH, Patient underwent fasciotomies of the right lower extremities, and attempts were made to treat Patient's other associated conditions as necessary before any attempt could be made for Patient's complex wound closures, which services were performed on an urgent or emergency basis but in a staged fashion.

*September 22, 2018 ("First Surgery")*

54.     On or about September 22, 2018, Plaintiff, through its physicians, provided medical services to Patient at PGH, which services consisted of a complex surgery that were necessary to relieve or eliminate the medical conditions for which Patient initially sought treatment at PGH and/or those that developed subsequent to Patient's admission to PGH, including: excisional debridement through the skin and subcutaneous tissue on the medial side of the right leg, with a wound measuring approximately 30 cm by 10 cm; excisional debridement through the skin, subcutaneous tissue, and necrotic muscle on the lateral side of the right leg, with a wound measuring approximately 35 cm by 9 cm; peroneus longus and peroneus bravis bipedicle muscle flaps for coverage of the tibia; complex closure of the superior and inferior portions of the wound; and other related procedures  (the "First Surgery").

*September 24, 2018 ("Second Surgery")*

55.     After the First Surgery, Patient's condition remained unstable due in part to the severe nature of Patient's traumatic injuries and associated complications, and Patient continued to suffer from, among other things, open fasciotomy wounds of the right medial and lateral leg measuring 35 cm x 8 cm and 33 cm x 7 cm, respectively; muscle necrosis; necrotic muscle and soft tissue defect of the right lower leg; and other associated conditions, which conditions manifested themselves by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably have been expected to result in serious jeopardy to Patient's health, serious impairment to Patient's bodily functions, and/or serious dysfunction of Patient's bodily organ(s) or part(s).

56.     Accordingly, on or about September 24, 2018, Patient was returned to the operating room at PGH on an urgent or emergency basis to address the conditions, detailed above, that developed and/or persisted subsequent to the First Surgery.

57.     On or about September 24, 2018, Plaintiff, through its physicians, provided medically necessary services to Patient at PGH, which services consisted of a complex surgery that was necessary to relieve or eliminate the medical conditions for which Patient initially sought treatment at PGH and/or those that developed subsequent to Patient's admission to PGH, including: excisional debridement through the skin, subcutaneous tissue, and medial muscle; rotational medial gastroc flap for coverage of vacuous defect left after debridement; split-thickness skin graft measuring 30 cm x 8 cm at the medial leg; split-thickness skin graft measuring 28 cm x 7 cm at the lateral leg; closure of complex lacerations; and other related procedures (the "Second Surgery").

### *June 6, 2019 ("Third Surgery")*

58.     After the First and Second Surgeries, Patient's complex wounds healed. However, because of the lack of skin and subcutaneous tissue, the skin graft on Patient's muscle was painful and uncomfortable when it was bumped or when pressure was applied.

59.     Accordingly, on or about June 6, 2019, Patient was returned to the operating room at PGH on an urgent basis and/or as a continuation of care from the First and Second Surgeries to address the conditions, detailed above, that developed and/or persisted subsequent to those Surgeries.

60.     On or about June 6, 2019, Plaintiff, through its physicians, provided medically necessary services to Patient at PGH, which services consisted of a complex surgery that was necessary to relieve or eliminate the medical conditions for which Patient initially sought treatment at PGH and/or those that developed subsequent to Patient's admission to PGH and the First and Second Surgeries, including: tangential excision of the symptomatic split-thickness skin graft, measuring 23 cm x 8 cm; closure of the wound; and other related procedures (the "Third Surgery").

*Defendant's Underpayment of the Claims*

61.      Plaintiff submitted claims for reimbursement to Defendant for the services Plaintiff provided to Patient as part of the Surgeries (collectively, the "Claims").

62.      Plaintiff's charges for medically necessary services it provided as part of the First Surgery totaled $94,111.00, as reflected on the Claims. Defendant paid only $4,132.25 to Plaintiff for those services.

63.      Plaintiff's charges for the medically necessary services it provided as part of the Second Surgery totaled $134,170.00, as reflected on the Claims. Defendant paid only $4,806.84 to Plaintiff for those services.

64.      Plaintiff's charges for the medically necessary services provided it as part of the Third Surgery totaled $41,100.00, as reflected on the Claims. Defendant paid only $2,338.70 to Plaintiff for those services.

65.      Accordingly, Plaintiff's charges for the services underlying the Claims totaled $269,381.00.

66.      To date, Defendant has paid Plaintiff a total of only $11,277.79 on the Claims, representing only 4.1% of Plaintiff's charges for the services at issue.

67.      In connection with such underpayments, Defendant issued remittance notices to Plaintiff in Fort Lauderdale, Florida, and made the foregoing underpayments to Plaintiff through interstate wire.

68.      In those remittance notices, Defendant included remarks such as: "Health care professional: patient is not liable for this additional amount if you accept the established reimbursement schedule allowed amount shown. Call Zelis…before billing the patient more than the amount shown as patient liability."

69.     Zelis Healthcare, Inc. ("Zelis") is a repricing company that provides supplemental networks to payers like Defendant. Defendant uses Zelis as its agent to negotiate or otherwise determine payment amounts to out-of-network providers (like Plaintiff) when Defendant initially underpays claim submitted by those providers.

70.     Notwithstanding the terms of the Network Savings Agreement, Defendant, through companies like Zelis, in turn, attempts to coerce out-of-network providers (like Plaintiff) to accept drastic underpayments on their claims and to waive any further rights to seek additional payment so that Zelis and Defendant can "skim" a percentage of the "savings" on such claims to retain for themselves, thus obtaining a direct benefit from the entire transaction.

71.     By utilizing Zelis during administration of the Claims, Defendant implicitly acknowledged it was appropriate to look outside the Policy in administering those Claims, either through the Network Savings Agreement, TRPN, or otherwise.

72.     Defendant further included remarks on the remittance documents for the Claims directing Patient to "call Cigna if billed more than the 'what I owe' amount." The only basis for this representation by Defendant to Patient would be an agreement between Plaintiff and Defendant pursuant to which Plaintiff agreed not to balance bill Patient, as there is no other agreement limiting Plaintiff's ability to balance bill the Patient.

73.     Defendant already adjudicated the Claims and provided coverage for most of the underlying services, and in fact paid Plaintiff for the medical services it provided to Patient, albeit at rates inappropriately below the TRPN Rate and the fair market or reasonable value for Plaintiff's services.

74.     Plaintiff performed the Surgeries and submitted the Claims with the understanding and expectation that Defendant would reimburse Plaintiff for the services provided to Patient at the TRPN Rate or, in the alternative, at the reasonable fair market value of such services.

75.     Plaintiff's understanding and expectation in this regard was based upon, among other things: (a) negotiations regarding the proposed terms of the Network Savings Agreement; (b) Defendant's promise (through its authorized agent, TRPN) to reimburse Plaintiff for "covered services" (i.e., medical necessary services) that it provides to Patient and other of Defendant's members at the TRPN Rate; (c) Defendant's course of dealings with Plaintiff, whereby Defendant agreed to and in fact did reimburse Plaintiff at the TRPN Rate or, alternatively, at the fair market or reasonable value, for similar services provided to Defendant's other members; (d) Defendant's obligation to ensure that Patient and Defendant's other members could access and receive medically necessary care from providers without unreasonable delay or burden; (e) verbiage contained in the remittance notices issued by Defendant to Plaintiff in connection with processing the Claims that directed Plaintiff not to balance bill Patient; (f) verbiage contained in the remittance notices issued by Defendant to Patient advising Patient to contact Defendant if Patient was balance billed on the Claims; and/or (g) Defendant's adjudication of the Claims, which determined that the services underlying the Claims were "covered services" (i.e., medically necessary).

76.     At all material times, Defendant was and is aware that Plaintiff provided medical services to Patient and billed Defendant for same with the expectation and understanding that its services had been approved by Defendant and that it would be reimbursed by Defendant at rates reflecting the TRPN Rate applicable to the services provided to Patient, or alternatively, at rates reflecting the fair market or reasonable value (i.e., *quantum meruit*) of such services.

77.     Defendant ultimately adjudicated the Claims and determined that the services underlying the Claims were covered (i.e., medically necessary) services.

78.     After adjudicating the Claims, Defendant provided coverage for the medical services at issue and paid for the Claims, albeit at rates inappropriately below the TRPN Rate and/or the reasonable fair market value for the services underlying the Claims.

79.     The rates at which Defendant paid Plaintiff are less than the rates Plaintiff received during the same time period from other, similar managed care organizations for similar services provided in the same community.

80.     The difference between the amounts Defendant paid and Plaintiff's billed charges totals **$258,103.21**.

81.     All necessary conditions precedent to Plaintiff bringing this action have occurred or were performed, excused, and/or waived.

**COUNT I**
**Breach of Express Contract – Network Savings Agreement**
*Alternative to Remaining Counts*

82.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 above.

83.     This is an action for monetary damages against Defendant for its breach of the Network Savings Agreement.

84.     As set forth in detail above, with full knowledge and intent, the parties duly negotiated and entered into the Network Savings Agreement.

85.     Pursuant to the Network Savings Agreement, Defendant promised and was, at all material times, contractually obligated to reimburse Plaintiff for the medical services that it provided to Patient as part of the Surgeries at the TRPN Rate (i.e., 93% of Plaintiff's billed charges).

86.     Plaintiff did, in fact, provide medically necessary services to Patient as part of the Surgeries and submitted the Claims to Defendant with the understanding and expectation that Defendant would reimburse Plaintiff for such services at the TRPN Rate.

87.     Plaintiff fully performed in accordance with the terms of the Network Savings Agreement.

88.     As set forth in detail above, however, Defendant materially breached the Network Savings Agreement by failing and/or refusing to fully pay Plaintiff for all services that Plaintiff provided as part of the Surgeries at the TRPN Rate.

89.     Defendant has refused to cure and/or remedy the foregoing breach, although duly demanded.

90.     As a direct and proximate result of Defendant's breach of the Network Savings Agreement, Plaintiff has been damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff for all direct, incidental, and consequential damages; costs; all applicable interest; and for such other and further relief that this Court may deem just and proper.

### COUNT II
### Breach of Implied-in-Fact Contract – TRPN Rate
*Alternative to Remaining Counts*

91.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 above.

92.     This Count II is plead in the alternative to all remaining counts.

93.     At all material times, Defendant defined "participating providers" to include both "in-network" providers with which Defendant has a direct contractual relationships and providers that are "out-of-network" with Defendant but with which Defendant has an indirect contractual relationship, i.e., providers who participate in network savings programs like and including TRPN.

94.    At all material times, Plaintiff was a provider in the TRPN network savings program, and Defendant was a TRPN Client. Defendant therefore recognized Plaintiff as a "participating provider."

95.    As described in detail above, Plaintiff has conferred a direct benefit on Defendant by, among other things: (a) providing Defendant with access to "out-of-network" medical services provided by Plaintiff at a discounted rate, thereby making Defendant a more attractive option to potential customers by enhancing Defendant's networks; (b) ensuring that Patient (and Defendant's other members) have prompt and reasonable access to "out-of-network" medical providers like Plaintiff for which Defendant is legally obligated to provide coverage and pay; (c) agreeing to provide discounted rates for services provided to Patient, thereby reducing the amount of Defendant's financial liability for those services; (d) allowing Defendant to meet its statutory obligations to provide coverage for emergency medical services; and/or (e) allowing Patient to avoid being subject to balance billing for the services provided as part of the Surgeries, thereby eliminating complaints by Patient that would have occurred had Plaintiff instead sought the balance of its bill from Patient.

96.    Defendant approved of Patient's admissions to PGH and approved of the provision of medical services to Patient by providers like Plaintiff as detailed above.

97.    At the time Defendant approved of the provision of medical services to Patient by providers like Plaintiff, Defendant knew or should have known that Plaintiff was a contracted provider with TRPN and that the Network Savings Agreement requires payment at 93% of Plaintiff's billed charges.

98.    As described above, Defendant tacitly promised to pay Plaintiff for the Surgeries at the TRPN Rate by, among other things: (a) defining "participating providers" to include providers

who participate in network savings program like TRPN; (b) contracting with TRPN to be a TRPN Client; (c) permitting itself to be listed as a TRPN Client on the TRPN Payer List; (d) issuing a member ID card to Patient stating that it recognized network savings programs like TRPN for services rendered to Patient; (e) approving of Patient's admissions to PGH and the provision of medical services to Patient by providers like Plaintiff during those admissions; and/or (f) paying Plaintiff for services provided to other members of Defendant at the TRPN Rate.

99.     In exchange, Plaintiff agreed to: (a) accept discounted rates for all medically necessary services that it provides to Patient (and Defendant's other members); and/or (b) not balance bill Patient (and/or other members enrolled under an insurance policy issued and/or administered by Defendant).

100.     Defendant in fact recognized the existence of the parties' implied-in-fact contract by directing Plaintiff not to balance bill the Patient and by advising Patient to contact Defendant if Patient was balance billed.

101.     Moreover, the course of dealing between the parties was such that Defendant often paid Plaintiff at the TRPN Rate for similar services that Plaintiff provided to Defendant's other Policy members, thereby establishing a common basis of understanding between the parties that Defendant would pay Plaintiff for the Surgeries at issue in this case at the TRPN Rate.

102.     Defendant therefore knew or should have known that Plaintiff was conferring the above benefits with the expectation that it would be reimbursed by Defendant for same at the TRPN Rate or the reasonable/fair market value of same.

103.     Plaintiff fully performed its obligations under the parties' contract by performing the Surgeries and by not balance billing Patient on the Claims.

104.     As set forth in detail above, however, Defendant materially breached the parties'
agreement by failing and/or refusing to fully pay Plaintiff for all services that Plaintiff provided as
part of the Surgeries at the TRPN Rate.

105.     Defendant has refused to cure and/or remedy the foregoing breach, although duly
demanded.

106.     As a direct and proximate result of Defendant's breach of the parties' implied-in-
fact contract (i.e., Defendant's tacit promise to pay Plaintiff at the TRPN Rate), Plaintiff has been
damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in
favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to
Plaintiff for the Surgeries and the TRPN Rate, together with an award of all applicable interest,
costs, and such other and further relief as the Court may deem just and proper.

## COUNT III
## Promissory Estoppel
### *Alternative to Remaining Counts*

107.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 25, 27
through 30, 33 through 45, and 47 through 81 above.

108.     This Count III is pled in the alternative to all remaining counts.

109.     As described in detail above, Defendant (directly and/or through its authorized
agent, TRPN) promised to pay Plaintiff for any medically necessary services (like and including
the Surgeries) that Plaintiff provided to Defendant's members (like and including Patient) at the
TRPN Rate.

110.     Defendant further promised to pay Plaintiff at the TRPN Rate by issuing a member
ID card to Plaintiff representing that Defendant recognizes network savings programs, like TRPN,
for services provided to Patient.

111.    At all material times, Defendant knew (or had reason to know) that Plaintiff was reasonably relying upon Defendant's promise in that regard by providing medical services to Defendant's members with the reasonable expectation and understanding that it would be reimbursed by Defendant at the TRPN Rate.

112.    Plaintiff did, in fact, reasonably rely on Defendant's promise to reimburse Plaintiff at the TRPN Rate by, among other things, agreeing to provide services to Patient as part of the Surgeries, to its detriment.

113.    By approving of the Surgeries and related admissions to PGH, Defendant knew and approved of Plaintiff providing medical services to Patient as part of the Surgeries.

114.    Based upon Defendant's representations and Plaintiff's reasonable reliance on those representations, Defendant is estopped from repudiating and/or denying the terms of the agreement described above.

115.    Defendant knew or should have known that Plaintiff would reasonably rely upon Defendant's promise to reimburse Plaintiff at the TRPN Rate for the services it provided to Patient as part of the Surgeries.

116.    Defendant failed to reimburse Plaintiff at the promised TRPN Rate for the services that Plaintiff provided as part of the Surgeries.

117.    As a result of Defendant refusing to reimburse Plaintiff for the Surgeries at the TRPN Rate, Plaintiff has suffered injury and is entitled to monetary damages from Defendant.

118.    Under the circumstances set forth above, it is unjust and inequitable for Defendant to refuse to honor its promise to pay Plaintiff for the Surgeries at the TRPN Rate.

119.    Injustice can be avoided only by enforcement of Defendant's promise to pay Plaintiff at the TRPN Rate through the doctrines of promissory estoppel.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the Surgeries and the TRPN Rate, together with an award of all applicable interest, costs, and such other and further relief as the Court may deem just and proper.

**COUNT IV**
**Breach of Implied-in-Fact Contract – Fair Market Value**
*Alternative to Remaining Counts*

120.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 20, 24, 39, 41 through 43, and 47 through 81 above.

121.    This Count IV is pled in the alternative to all remaining counts.

122.    As described in detail above, Plaintiff has conferred a direct benefit on Defendant by: (a) providing Defendant with access to "out-of-network" medical services provided by Plaintiff at a discounted rate, thereby making Defendant a more attractive option to potential customers by enhancing Defendant's networks; (b) ensuring that Patient (and Defendant's other members) have prompt and reasonable access to "out-of-network" medical providers like Plaintiff for which Defendant is legally obligated to provide coverage and pay; (c) agreeing to provide discounted rates for services provided to Patient, thereby reducing the amount of Defendant's financial liability for those services; (d) allowing Defendant to meet its statutory obligations to provide coverage for emergency medical services; and/or (e) allowing Patient to avoid being subject to balance billing for the services provided as part of the Surgeries, thereby eliminating complaints by Patient that would have occurred had Plaintiff instead sought the balance of its bill from Patient.

123.    Upon information and belief, Defendant: (a) approved of Patient's admissions into PGH for the treatment of Patient's medical conditions; (b) approved of the provision of medical services to Patient by providers like and including Plaintiff during those admissions; and (c) tacitly

agreed to pay Plaintiff the reasonable value for the services rendered to Patient as part of the Surgeries.

124.    In exchange, Plaintiff agreed to perform the Surgeries on Patient and not to balance bill Patient for the Surgeries.

125.    Defendant in fact recognized the existence of the parties' implied-in-fact contract by directing Plaintiff not to balance bill the Patient and by advising Patient to contact Defendant if Patient was balance billed.

126.    Defendant further acknowledged its obligation and responsibility for payment and its approval of Plaintiff's performing medical services as part of the Surgeries by paying the Claims for those services and/or issuing remittance notices to Plaintiff reflecting allowed amounts for those services, albeit at rates far below that to which Plaintiff is entitled.

127.    Moreover, the course of dealing between the parties was such that Defendant often paid Plaintiff at the fair market or reasonable value for similar services that Plaintiff provided to Defendant's other Policy members, thereby establishing a common basis of understanding between the parties that Defendant would pay Plaintiff for the Surgeries at issue in this case at the fair market or reasonable value of same.

128.    Defendant therefore knew or should have known that Plaintiff was conferring the above benefits with the expectation that it would be reimbursed by Defendant for same at the fair market or reasonable value of same.

129.    Plaintiff fully performed its obligations under the parties' implied-in-fact contract by performing the Surgeries and by not balance billing Patient for the Surgeries.

130.     As set forth above, however, Defendant materially breached the parties' agreement by failing and/or refusing to pay Plaintiff the fair market or reasonable value for all services that Plaintiff provided as part of the Surgeries.

131.     Defendant has refused to cure and/or remedy the foregoing breach, although duly demanded.

132.     As a direct and proximate result of Defendant's breach of the parties' implied-in-fact contract (i.e., Defendant's tacit promise to pay Plaintiff at the fair market or reasonable value), Plaintiff has been damaged.

133.     The circumstances are such that it would be inequitable for Defendant to retain the aforementioned benefits without paying fair value for same.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the Surgeries and the reasonable fair market value of those medical services, as determined by the finder of fact, together with an award of all applicable interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT V
### Unjust Enrichment/Breach of Implied-in-Law Contract
*Alternative to Remaining Counts*

134.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 23, 30, 32, 35 through 36, 41 through 43, and 47 through 81 above.

135.     This Count V is pled in the alternative to all remaining counts.

136.     Under established Florida precedent, Plaintiff conferred a direct benefit on Defendant by providing valuable medical services to Patient at PGH as part of the First, Second, and Third Surgeries, with the knowledge and/or approval of Defendant. *See Merkle v. Health Options, Inc.*, 940 So. 2d 1190, 1199 (Fla. 4th DCA 2006), *rev. denied*, 962 So. 2d 336 (Fla. 2007);

*Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 899 So. 2d 1222, 1228 (Fla. 1st DCA 2005).

137.    More particularly, as described in detail above, Plaintiff has conferred a direct benefit on Defendant by: (a) providing Defendant with access to "out-of-network" medical services provided by Plaintiff at a discounted rate, thereby making Defendant a more attractive option to potential customers by enhancing Defendant's networks; (b) ensuring that Patient (and Defendant's other members) have prompt and reasonable access to "out-of-network" medical providers like Plaintiff for which Defendant is legally obligated to provide coverage and pay; (c) agreeing to provide discounted rates for services provided to Patient, thereby reducing the amount of Defendant's financial liability for those services; (d) allowing Defendant to meet its statutory obligations to provide coverage for emergency medical services; (e) allowing Patient to avoid being subject to balance billing for the services provided as part of the Surgeries, thereby eliminating complaints by Patient that would have occurred had Plaintiff instead sought the balance of its bill from Patient; and/or (f) providing said benefits through an intermediary third party (i.e., TRPN).

138.    Plaintiff's provision of covered of such medical services to Patient further benefitted Defendant because it offered a more permanent and/or more beneficial solution to the medical conditions for which Patient initially sought treatment on the dates set forth above, negating Patient's need to seek additional medical treatment in the future for which Defendant would be financially liable. In other words, by minimizing (if not entirely eliminating) Patient's future medical expenses, and thus medical claims to Defendant, including expenses and claims for prolonged alternative treatments or additional medical services or complications arising from an

inferior treatment regimen, which claims and expenses Defendant would be responsible for administering and paying, Plaintiff conferred a benefit directly on Defendant.

139.    Defendant acknowledged, accepted, and retained the benefits so conferred from Plaintiff's providing such medical services to Patient as part of the Surgeries, because it allowed Defendant to fulfill its legal obligations to: (a) provide coverage for emergency medical services rendered to its members, like and including Patient; and (b) ensure that its members, like and including Patient, have access to and receive medically necessary care without unreasonable delay or burden.

140.    Defendant has failed to pay the reasonable value of the benefit conferred upon it by Plaintiff, in this case, the reasonable value of the services provided to Patient as part of the Surgeries.

141.    By refusing to pay Plaintiff appropriately, Defendant has been unjustly enriched.

142.    The circumstances are such that it would be unjust and inequitable for Defendant to retain the direct benefit conferred on it by Plaintiff without paying the fair market or reasonable value of same.

143.    Plaintiff seeks compensatory damages, as permitted by applicable law, in an amount equal to the difference between the amounts Defendant paid to Plaintiff for the Claims and the fair market or reasonable value of the medical services underlying the Claims, plus interest.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the Surgeries and the reasonable fair market value of the medical services of those medical services, as determined by the finder of fact, together with an award of all applicable interest, costs, and such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues so triable.

DATE: January 30, 2023.

Respectfully submitted,

By:     */s/ Genevieve Lee Turner*
        RICHARD P. HERMANN, II, ESQ
        Florida Bar No. 110019
        Primary E-Mail: rhermann@sbwh.law
        Secondary E-Mail: floridaservice@sbwh.law
        GENEVIEVE LEE TURNER, ESQ.
        Florida Bar No. 100058
        Primary E-Mail:  gturner@sbwh.law
        Secondary E-Mail:  ksandoval@sbwh.law

        **SHAPIRO, BLASI, WASSERMAN &
        HERMANN, P.A.**
        *Attorneys for Plaintiff*
        7777 Glades Road, Suite 400
        Boca Raton, Florida 33434
        Telephone: (561) 477-7800
        Facsimile: (561) 477-7722